641 So.2d 369 (1994)
Dwayne Irwin PARKER, Appellant,
v.
STATE of Florida, Appellee.
No. 76172.
Supreme Court of Florida.
June 16, 1994.
Rehearing Denied August 31, 1994.
*372 Richard L. Jorandby, Public Defender and Gary Caldwell, Asst. Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen. and Sara D. Baggett, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Dwayne Parker appeals his convictions of first-degree murder and other crimes and sentence of death. We have jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution, and affirm Parker's convictions and sentence.
Shortly after 11 p.m. on April 22, 1989, Ladson Marvin Preston and Dwayne Parker entered a Pizza Hut in Pompano Beach. Preston was unarmed, but Parker was armed with both a small pistol and a semi-automatic machine pistol. They forced the manager to open the safe at gunpoint, and then Parker returned to the dining room and robbed the customers of money and jewelry. Sixteen customers and employees were in the restaurant, and Parker fired six shots from the machine pistol during the robberies, wounding two customers.
While Parker was in the dining room, an employee escaped from the restaurant and telephoned 911 from a nearby business. Broward County deputies arrived shortly, and first Preston and then Parker left the restaurant. Deputy Killen confronted Parker in the parking lot, and Parker fired five shots at him with the machine pistol. Parker then ran into the street and tried to commandeer a car occupied by Keith Mallow, his wife, and three children. Parker fired the machine pistol once into the car and then fled.
When someone entered a nearby bar and told the patrons that the Pizza Hut was being robbed, several of those patrons, including William Nicholson, the homicide victim, left the bar and went out into the street. Tammy Duncan left her house when she heard shots and saw Parker, carrying a gun, running down the street with Nicholson running after him. She heard another shot and saw Nicholson clutch his midsection and then fall to the ground.
Eventually deputies Baker, Killen, and McNesby cornered Parker between two houses. McNesby's police dog subdued Parker, and he was taken to the sheriff's station. The machine pistol and some of the stolen jewelry were found on the ground when Parker was taken into custody. At the station money and more of the stolen jewelry were found on Parker.
The state charged Parker with one count of first-degree murder, two counts of attempted murder, and nine counts of armed robbery. Six shell casings were found inside the restaurant, five in the parking lot, and one in the street near where Nicholson fell.[1] The state's firearms expert testified that all twelve shell casings, as well as the bullet recovered from Nicholson's body, had been *373 fired from Parker's machine pistol. The theory of defense, however, was that the bullet was misidentified and that a deputy shot Nicholson. The jury convicted Parker as charged on the murder and armed robbery charges and of aggravated battery with a firearm on the two counts of attempted murder. The trial court agreed with the jury's recommendation and sentenced Parker to death.
As his first point on appeal, Parker argues that the court erred in denying his challenges for cause to sixteen prospective jurors, four of whom served on the jury.[2] Parker challenged these people because at one time or another they indicated that they would always vote for the death penalty, did not believe that life imprisonment meant spending the rest of one's life in jail, expected the defense to demonstrate innocence, or were too nervous to concentrate on the case, among other things. The court and the prosecutor, however, posed additional questions to the prospective jurors after the challenges, and each indicated affirmatively that he or she would follow the law and instructions given by the court and base the decision on the instructions and the evidence. Parker used all of his original ten peremptory challenges and requested six more, stating: "There are at least six jurors that should be stricken, I believe, to give us a shot at a fair and impartial jury." Parker did not identify those six jurors, however. The court held that no cause had been shown, but, in its discretion, gave two more peremptory challenges to the defense. When the jury was seated, Parker renewed his challenges for cause to the four people left that he originally challenged. He has preserved the issue for review.
As we have long held, "the competency of a challenged juror is a mixed question of law and fact, the resolution of which is within the trial court's discretion." Hall v. State, 614 So.2d 473, 476 (Fla.), cert. denied, ___ U.S. ___, 114 S.Ct. 109, 126 L.Ed.2d 74 (1993); Singer v. State, 109 So.2d 7 (Fla. 1959). The test for determining that competency "is whether the juror can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by the court." Lusk v. State, 446 So.2d 1038, 1041 (Fla.), cert. denied, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984); Foster v. State, 614 So.2d 455 (Fla. 1992), cert. denied, ___ U.S. ___, 114 S.Ct. 398, 126 L.Ed.2d 346 (1993); Pentecost v. State, 545 So.2d 861 (Fla. 1989). In evaluating a juror's qualifications, the trial judge should evaluate all of the questions and answers posed to or received from the juror. Our study of the transcripts of the jury selection does not support Parker's allegations that an unqualified or biased juror failed to be excused for cause. Rather, questioning by the state and the court established that the prospective jurors that Parker challenged for cause met the Lusk standard for competency. We find no abuse of the judge's discretion in his denying the challenges for cause and no merit to this issue.
Parker also claims that the trial court committed reversible error by requiring the parties to exercise their peremptory challenges simultaneously in writing. He asked that each side be allowed to exercise its peremptories in turn and now argues that the method used by the trial court violated Ter Kuerst v. Miami Elevator Co., 486 So.2d 547 (Fla. 1986). In that case we quashed the district court's approval of the simultaneous exercise of peremptory challenges that resulted in the excusal of only five prospective jurors when the two sides had six challenges between them. There is no claim here that either side was precluded from exercising all of the peremptories allotted to it and no harm from the method employed is demonstrated.
Parker also argues that three discovery violations occurred. First, he claims that a continuance should have been granted because of the state's tardy disclosure of two *374 witnesses.[3] These witnesses' names were disclosed two weeks prior to trial, and counsel declared he was satisfied with discovery after deposing them and did not object when they testified. Therefore, we see no discovery violation, and no error in denying a continuance, regarding these two minor witnesses. See Duest v. State, 462 So.2d 446 (Fla. 1985); Taylor v. State, 589 So.2d 918 (Fla. 4th DCA 1991).
Second, Parker claims that the court failed to conduct a Richardson[4] hearing when the state introduced an undisclosed grand jury report during re-direct examination of Deputy McNesby. Parker's theory of defense was that McNesby shot the victim and, on cross-examination, counsel quizzed him sharply about being the subject of a previous internal affairs investigation. On redirect the state introduced the grand jury report exonerating McNesby. Parker objected, claiming a discovery violation, and requested time to review the document. After reviewing it, counsel questioned McNesby again and made no further objection and did not request a Richardson hearing. These facts demonstrate no error and that this issue has no merit.
Third, Parker claims that the court erred by allowing into evidence photographs of the bullet removed from Nicholson that were different in coloring than the original prints.[5] Detective Cerat attended the autopsy and took the photographs that yielded the original and subsequent prints and testified that, because of the flash, the bullet in the original prints appeared white in the middle and gold at the edges. Parker cross-examined Cerat extensively about photography. The state later sought to introduce the new prints, and the court inquired about a discovery violation. After listening to the parties, the judge held that the two newest prints constituted an inadvertent discovery violation, but, since the defense had known about the color variation, that Parker had suffered no prejudice. We hold that the court conducted an adequate Richardson hearing as to the photographs and that Parker has demonstrated no reversible error regarding this issue.
As his next point, Parker claims that the court ignored his complaints about his counsel's competency.[6] Our review of the *375 record shows that Parker was complaining about the criminal justice system, not about his counsel's abilities as an advocate, and that he did not request substitute counsel. Therefore, we find no merit to the instant argument.
Parker also argues that reversible error occurred regarding three guilt-phase instructions and the prosecution's argument. We disagree. This trial occurred before our amendment of the excusable homicide instruction in State v. Smith, 573 So.2d 306 (Fla. 1990), and we find any error in the instruction given to have been harmless beyond a reasonable doubt. The court did not err in denying the specially requested instruction requiring jury unanimity as to whether a premeditated or felony murder was committed because special verdicts identifying the type of murder are not required. E.g., Haliburton v. State, 561 So.2d 248 (Fla. 1990), cert. denied, 501 U.S. 1259, 111 S.Ct. 2910, 115 L.Ed.2d 1073 (1991). Parker did not object to the reasonable doubt instruction, so any complaint about its wording has not been preserved for review. Henry v. State, 613 So.2d 429 (Fla. 1992), cert. denied, ___ U.S. ___, 114 S.Ct. 699, 126 L.Ed.2d 665 (1994).
During closing argument, the prosecutor stated: "Now in order to believe that theory or fantasy that Mr. Hitchcock told you about, about the Stans and this... ." Defense counsel stated: "I would like to reserve a motion your honor," and, following the prosecutor's argument moved for a mistrial based on that argument's "characterizing the defense as a fantasy." The court found the state's comment to have been "fair comment, perhaps invited by the closing argument by the defense."[7] Even if this issue had been preserved through a timely objection,[8] *376 we would find no abuse of discretion in the court's ruling. Breedlove v. State, 413 So.2d 1 (Fla.), cert. denied, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982).
On April 25, 1990, the state petitioned the court to issue an order to show cause for one of the robbery victims who failed to appear on April 23. Parker claims that the court's hearing and ruling on this petition constituted an improper ex parte proceeding. Contrary to his assertion, however, this witness was not favorable to the defense,[9] and the hearing consisted only of legal or administrative matters in which Parker would have had no control over what the court heard. This was not a critical stage of the trial, and we find no error in Parker's being absent from this hearing. See Junco v. State, 510 So.2d 909 (Fla. 3d DCA), review denied, 518 So.2d 1276 (Fla. 1987).
There is no merit to Parker's claim that a killing during flight from the commission of a felony is not felony murder. The purpose of the felony-murder statute
is to protect the public from inherently dangerous situations caused by the commission of the felony. State v. Hacker, 510 So.2d 304, 306 (Fla. 4th DCA 1986). Therefore, "[i]n the absence of some definitive break in the chain of circumstances beginning with the felony and ending with the killing, the felony, although technically complete, is said to continue to the time of the killing." Mills v. State, 407 So.2d 218, 221 (Fla. 3rd DCA 1981).
Parker v. State, 570 So.2d 1048, 1051 (Fla. 1st DCA 1990). No definite break in the chain of circumstances occurred between the robberies and the killing in this case.
The week after the trial concluded Parker filed a motion for new trial alleging that a newly discovered witness saw a deputy shoot the victim. The court held a hearing on this allegation at which the new witness testified.[10] After hearing the testimony and the parties' argument, the court denied the motion, holding that the testimony was "so inconsistent, incredible, uncredible, and unworthy of belief that it is in effect discarded in its entirety by the Court."
As we have stated before, "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial" to be sufficient to require reversal. Jones v. State, 591 So.2d 911, 915 (Fla. 1991). As the court decided, Parker's "new" evidence did not meet this standard. Parker has shown no abuse of discretion in the trial court's ruling, and we will not disturb its determination of this issue. Jent v. State, 408 So.2d 1024 (Fla. 1981), cert. denied, 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982); Stone v. State, 616 So.2d 1041 (Fla. 4th DCA 1993).
Our review of the record shows that Parker's convictions are supported by competent substantial evidence. We therefore affirm those convictions.
Parker requested thirty special penalty-phase jury instructions and now argues that the court committed reversible error in refusing to give them. We disagree. All of the requested instructions are either adequately covered by the standard instructions, misstate the law, or were not supported by the evidence. The trial court, therefore, did not err in denying them. Moreover, we find no error in the instructions the court did give to the jury.[11]
*377 Parker also argues that the prosecutor made improper comments to the jury during closing argument. He did not, however, object to the complained-about comments, and, thus, this issue has not been preserved for review. Henry. If this argument were cognizable, we would hold that it had no merit because the comments were neither improper nor erroneous.
In sentencing Parker to death the court found that four aggravators had been established: previous conviction of violent felony; knowingly created a great risk of death to many persons; committed while engaged in committing, or during flight after committing, a robbery; and committed to avoid or prevent arrest. The court found that no statutory mitigators had been established and, after considering all the evidence, held that no nonstatutory mitigators had been established either. Parker now argues that the trial court improperly relied on nonstatutory aggravators, that the great risk and avoid arrest aggravators are not supported by the evidence, and that the court erred in its consideration of the mitigating evidence. We disagree.
During its narrative of the facts, the court mentioned that Parker left Nicholson to bleed to death in the street and that there were three children in the Mallow car. Rather than being nonstatutory aggravators, these items are simply facts. Additionally, the facts support all of the aggravators found by the court beyond a reasonable doubt.[12] The killing occurred during Parker's flight after committing numerous felonies. He knew he was being pursued by the police and that, when caught, he would be arrested and prosecuted. Cf. Young v. State, 579 So.2d 721 (Fla. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1198, 117 L.Ed.2d 438 (1992); Grossman v. State, 525 So.2d 833 (Fla. 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989). The great risk aggravator is also supported by the record. At least twenty-three people,[13] including the homicide victim, were put at risk by Parker. E.g., Trepal v. State, 621 So.2d 1361 (Fla. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 892, 127 L.Ed.2d 85 (1994); Rivera v. State, 545 So.2d 864 (Fla. 1989); Suarez v. State, 481 So.2d 1201 (Fla. 1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2908, 90 L.Ed.2d 994 (1986).
Contrary to Parker's contention, the court gave ample consideration to all of the evidence Parker submitted in mitigation. "A trial court must consider the proposed mitigators to decide if they have been established and if they are of a truly mitigating nature in each individual case." Johnson v. State, 608 So.2d 4, 11 (Fla. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 2366, 124 L.Ed.2d 273 (1993); Campbell v. State, 571 So.2d 415 (Fla. 1990). The court did this, but found that the facts alleged in mitigation were not supported by the evidence. It is the court's responsibility to resolve conflicts in the evidence, and its determination will not be reversed if supported by the record. Lucas v. State, 613 So.2d 408 (Fla. 1992), cert. denied, ___ U.S. ___, 114 S.Ct. 136, 126 L.Ed.2d 99 (1993); Johnson; Pope v. State, 441 So.2d 1073 (Fla. 1983). The record supports the trial court's conclusion that no mitigators had been established.
As his final points, Parker argues that his death sentence is disproportionate and that Florida's capital sentencing scheme is unconstitutional. In light of the facts of this case, however, we find his death sentence proportionate. The constitutional challenges have been rejected previously, and we refuse to reconsider them. E.g., Sochor v. State, 619 So.2d 285 (Fla.), cert. denied, ___ U.S. ___, 114 S.Ct. 638, 126 L.Ed.2d 596 (1993); Young.
*378 Therefore, we affirm Parker's sentence of death.
It is so ordered.
GRIMES, C.J., OVERTON, SHAW, KOGAN and HARDING, JJ., and McDONALD, Senior Justice, concur.
NOTES
[1] The shell casing from the shot fired into the Mallows' car was not recovered.
[2] The trial court excused two of these sixteen on the state's challenges for cause because one (Linares) knew one of the robbery victims and talked with her about it and the other (Silverman) because he worked nights, was not used to being up during the day, and was certain that he would not be able to give the trial his full concentration.
[3] Nicholson's brother, who identified the victim's sandals, and Tina McKnight, a patron of the bar that Nicholson left after hearing about the robbery.
[4] Richardson v. State, 246 So.2d 771 (Fla. 1971).
[5] The sheriff's department used silver-colored 9 mm bullets, while Parker's machine pistol contained copper- or gold-colored bullets. If the bullet removed from the victim had been silver colored, it would have supported the defense's theory that Deputy McNesby shot the victim.
[6] Just prior to jury selection the following exchange took place:

THE COURT: Do you still want to talk to me Mr. Parker?
THE DEFENDANT: Yes, sir. Yes, sir, Your Honor. I've been aware of this matter for several months now, and I asked Mr. Hitchcock to ask the Court for a special investigation as far as this bullet, because it clearly states on this report a silver colored bullet is recovered from the deceased, and if this man takes the bullet out, and is the first person to see the bullet, and write it down here, and ironically the police carry silver bullets, and I have been stating since day one when they arrested me that I did not kill anybody and that the police killed this man, and now they're covering this up, and it's just a conspiracy. It's clearly a conspiracy.
THE COURT: All right. Your comments are on record.
Now, you told your lawyer that too, didn't you?
THE DEFENDANT: I've been asking him to ask for an investigation. He told me that he filed a motion to have the bullet checked and then I haven't heard anything from him on it, and I heard nothing today in court about it, and this is for my life, and it's just not fair.
THE COURT: I understand. I understand.
THE DEFENDANT: So I just  I was just hoping that the Court would consider something that they're trying to tell you, because it's  If I killed the man I am willing to pay the penalty, but I know I didn't kill him, and it clearly states right here in black and white. If the silver bullet is wrong, the whole report is wrong.
THE COURT: All right. Nobody can be convicted of something that they didn't do. It hasn't happened in 19 years that I have been a Judge and six that I have been a lawyer.
THE DEFENDANT: But if the whole police force is investigating the case, and then you got the State Attorney, the number one man, orchestrating it, anything can happen, Your Honor.
This man is here, they're everywhere, he hasn't been totally dedicated in investigating this case.
THE COURT: Mr. Parker, it's my job to rule on matters of law during the trial. The jury will decide the matters of evidence. It's up to the jury to decide those matters.
THE DEFENDANT: You're going to bring in I tried to kill a police, when the man is perfectly alive, you're going to bring in all kinds of stuff from other robberies, and what jury is going to believe my story when you got sergeants saying that they apprehended me with a gun, and that sergeant did not apprehend me, it just  I don't see any win for me unless I can have a special investigation independent of this county, investigating the whole case.
THE COURT: Put your feelings in writing.
THE DEFENDANT: That's what I have been asking for.
THE COURT: Put your feelings in writing and send them to whoever you think would help you out. I urge you to do that if you feel that way.
THE DEFENDANT: I don't have that knowledge, and I have been depending upon Mr. Hitchcock to do that and I don't understand why it ain't been done.
THE COURT: Then write a letter to Mr. Hitchcock and tell him what your feelings are.
THE DEFENDANT: I have already written several letters asking for investigation.
THE COURT: All right. We'll be in recess until 11:30, at which time we'll reconvene here.
... .
MR. HITCHCOCK: Your Honor, in view of Mr. Parker's comments to the Court, I would respectfully move for a defense continuance and suggest to the Court the following factors: Early in this case I asked to talk to the Court ex parte and you declined to do that. That was at the urging of my client, to discuss the matters that he basically brought up with you in his comments, and the reason for that request was that perhaps an independent investigation would be warranted because of the unusual factors in this case. After that, in discussions with my client, we felt somewhat secure in the testimony of Dr. Bell, not only his written word, his handwritten, his typewritten, but also his deposition, which was of course sworn and taken by us. We felt somewhat confident. Now, inasmuch as that has changed, not last week, the week before  of course I was out last week  Mr. Parker's request for an independent investigation seems very important now, and I don't frankly know, to be candid with this Court, whether that would be in the form of having the Federal Bureau of Investigation look into it, or whatever, but it seems to me that something  there's something awry in Denmark, and in this case Mr. Parker's concerns I think are well founded, that an independent investigation into the police handling of this case, the State Attorney's handling of this case  And particularly with regard to the bullet involved, I would move for a defense continuance so that we might have that independent investigation.
The court refused the requested continuance.
[7] The defense had first and last closing argument.
[8] "The proper procedure to take when objectionable comments are made is to object and request an instruction from the court that the jury is to disregard the remarks." Duest v. State, 462 So.2d 446, 448 (Fla. 1985). Parker did not comply with this procedure.
[9] This witness was one of several who identified Parker as the armed robber.
[10] The witness testified that the deputy that shot the victim was six feet two inches tall, weighed 220 to 230 pounds, had black curly hair, and wore wire-rimmed glasses. Although the physical appearances of deputies McNesby and Killen are not stated in the record, this description obviously did not match either of them. The witness also said that Parker was wearing a dark jacket, while all the other witnesses said it was tan or light brown. The witness said the victim was wearing a green army jacket, army boots, and a green plaid flannel shirt. In fact, the victim was wearing an orange tee shirt and sandals.
[11] Parker argues that the instructions on the great risk and avoid arrest aggravators are unconstitutionally vague, but he did not object to the wording of those instructions at trial and, therefore, failed to preserve this issue for appellate review.
[12] The argument that the felony-murder aggravator is unconstitutional has been rejected previously. E.g., Parker v. Dugger, 537 So.2d 969 (Fla. 1988).
[13] Sixteen people in the restaurant, Deputy Killen, five people in the Mallow car, and Nicholson. Additionally, there were other people in the parking lot and along Parker's attempted path of escape.